LIZZIE L. WRIGHT ET AL., APPELLEES, V. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, APPELLANT.

FILED SEPTEMBER 26, 1913. No. 17,189.

1. **Master and Servant**: INJURY TO SERVANT: RULES: SUFFICIENCY: QUESTION FOR JURY. A railroad company has a right, and it is its duty, to make reasonable rules for the protection of the safety of its employees, and such rules its employees are bound to regard and obey; but whether or not any particular rule, under the circumstances shown, is sufficient and adequate for the safety of the company's employees, is a question of fact for the jury.

2. ———: ———: NEGLIGENCE. Under the rules of the defendant company, the switch engine in its Lincoln yards had the right to occupy the main track, protecting itself against overdue trains. The extra, which was being run by plaintiff's decedent, was required to proceed through the yard under full control, and protect itself within yard limits. The switch engine having the right of way over the extra, it was the duty of the decedent to be on the lookout for the switch engine and to take such precautions as the situation demanded to prevent a collision; but this did not relieve the crew of the switch engine from the exercise of ordinary care in avoiding a collision with the extra, which they knew had entered the yard.

3. ———: ———: ———: QUESTION FOR JURY. The uncontradicted evidence shows that the defendant company, at and prior to the collision which caused the death of plaintiff's decedent, had not promulgated any written or printed rules regulating the rate of speed at which the switch engine might be run in its yards.

*Held*, That it was for the jury to say whether or not, under the circumstances shown, the failure of the company to adopt and promulgate such a rule was negligence oh its part.

4. Negligence: EVIDENCE. There being no evidence in the record tending to show negligence on the part of plaintiff's decedent, the question of contributory negligence does not arise.

5. Damages. The evidence shows that the decedent was a man of good health, 32 years of age; that he was earning from $125 to $150 a month; that his expectancy, according to the Carlisle table, would be 32 years. *Held*, That we cannot say that $15,000 is an excessive judgment under these circumstances.

6. Commerce: INTERSTATE. Plaintiff's decedent was running a lone engine, as an extra, from one point to another in this state, not in connection with any cars. *Held*, That he was not engaged in interstate commerce.

7. Instructions complained of and set out in the opinion, examined, and *held* free from prejudicial error.

8. The evidence examined and set out in the opinion, *held* sufficient to sustain the verdict and judgment.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed*.

*M. A. Low, P. E. Walker, E. P. Holmes* and *G. L. De Lacy,* for appellant.

*George W. Berge, contra.*

FAWCETT, J.

From a judgment for $15,000 in favor of the plaintiffs on account of the alleged negligence of the defendant in causing the death of Otto O. Wright, husband of plaintiff Lizzie L. Wright, defendant appeals.

The abstract contains 86 printed pages, the supplemental abstract 201 pages, the brief and reply brief of appellant 139 pages, and the brief of appellee 90 pages. To follow counsel through this voluminous record and through their equally voluminous briefs would necessitate an opinion of such length that it would be useless to the profession, for the reason that no lawyer would ever read it. We shall, therefore, deal directly with the material issues in the case.

Otto O. Wright was an engineer in the service of defendant. At the time set out in the pleadings he was ordered to run an engine, No. 1486, as "an extra" from Fairbury to Albright, both points in Nebraska. In making this run he was required to pass through the city of Lincoln. After leaving the station at Lincoln, and while running north through the company's yards at a point a short distance from the Holdrege street viaduct, this extra collided with the company's switch engine No. 1220, which was used by the defendant in its Lincoln yards for switching purposes, causing the death of Mr. Wright. These two engines will hereinafter be referred to by their respective numbers. The point where the collision occurred was in a cut and on a curve. The controlling, and in fact the only real question involved in this case, is, who was to blame for this collision?

It is shown that the defendant had rules for the guidance of its employees, including engineers. On its printed time-tables, such as were then used by engineers, rule 16 provided: "All except first class trains will approach (enter, and pass through the following named yards under full control), expecting to find main track occupied or obstructed. Albright, Fairbury, Lincoln, Belleville, Jansen, Phillipsburg." Subdivision *b* of rule 9 provided: "The speed of trains in the city of Lincoln between M street (two blocks west of passenger station) and Vine street (east of coal dock) must not exceed six miles per hour." Rule 97*a* in the book of rules promulgated by defendant provided: "Yard limits will be indicated by yard limit boards. Within these limits yard engines may occupy main tracks, protecting themselves against overdue trains. Extra trains must protect themselves within yard limits." The term, "under full control," in rule 16, all of the witnesses testified means "to be able to stop within the vision of the engineer." It is conceded that 1486 was required, while passing through the company's yards in the city of Lincoln, to proceed under such control. It is uncontradicted that the defendant had no written or printed rule

relating to the rate of speed at which its switch engines might run within its yards. There is some testimony to the effect that there was some sort of an unwritten rule or understanding that switch engines should also be run under full control; but the evidence is entirely satisfactory, and not contradicted by any testimony offered by defendant, that defendant's switching crew did not consider that it was bound by any such rule, except as to that portion of the Lincoln yard between M and Vine streets, which portion was not only covered by subdivision *b* of rule 9, but also by a city ordinance. Defendant in its brief urges 13 assignments of error, which we will consider in their order:

The first assignment is that the verdict is not sustained by sufficient evidence. In considering this assignment, the place where the collision actually occurred is important. There is a viaduct on Holdrege street at the place where that street is intersected by defendant's track. Holdrege street runs east and west. The collision occurred north of the viaduct; 1486 was running north, and 1220 south. In going north, after leaving the viaduct, the track curves to the east in a cut. The collision occurred in that cut. The point where the collision occurred is testified to by the engineer, fireman, switch foreman, and two of the switchmen who were riding on 1220, McLane, the fireman on 1486, and by four witnesses who resided in the immediate vicinity, and who visited the scene immediately after the collision. All of these witnesses locate the point of the collision as right opposite or a few feet south of a barn standing on the first lot east of the track, which lot faces south on Holdrege street. This lot is 135 feet in depth. The four residents of the vicinity locate the collision a little south of the barn. McKinstry, a switchman on 1220, says that 1486, after the collision, was about 35 or 40 feet south of the building shown in the photographs, which is the barn referred to. Some of the switching crew testify that the collision occurred about 150 feet north of the viaduct. This testimony, however, was simply

the opinion of the witnesses so testifying. This testimony cannot be considered in the face of the large number of witnesses whose uncontradicted testimony locates the exact place where the collision occurred in front or a few feet south of a fixed object or point by the side of the track. Considering, therefore, the length of the lot upon which the barn stood and the point in relation thereto, where these residents show the collision occurred, there is no escape from the conclusion that the collision actually occurred at a point about 100 feet north of the viaduct.

It is admitted that all of the members of the switching crew knew that the extra 1486 was in the yard. McKinstry, the switchman above referred to, was the first to discover that the two engines were running towards each other on the main track. He testifies that he immediately gave the alarm. The men on 1220 testify that when McKinstry gave the alarm the engineer threw on the emergency brake. When 1220 had run about 75 or 100 feet, McKinstry and some of the others jumped from the engine. All of the crew, including the engineer, jumped, but whether the others jumped at the same time McKinstry and Carr did, is not shown. Possibly the engineer remained on a little longer. According to McKinstry and Carr, 1220 proceeded about 25 feet after they jumped, before the collision occurred, so that, according to their testimony, 1220 proceeded about 100 feet, after McKinstry gave the alarm, before the collision occurred. Some of the witnesses on 1220 testify that at the time McKinstry gave the alarm 1220 was running from three to five miles an hour; others say from three to four miles an hour; yet McKinstry and Carr both say that when the collision occurred 1220 was going "not to exceed three miles an hour." The witness Palmer, engineer on the company's switch engine at the time of the trial, testified that he was familiar with engine 1220, and had run it; that an engine running at a rate of five miles an hour ought to be stopped in 20 feet, at 10 miles an hour in 30 feet, at 15 miles an hour in 45 feet, and at 20 miles an hour in 60 feet. This

24

testimony stands uncontradicted. It is thus clearly established that 1220 must have been running at a high rate of speed, or that the emergency brake was not applied and the engine reversed before the crew jumped from the engine. It is testified to by some of the crew of 1220, and conceded in the brief of defendant, that at the time McKinstry discovered 1486 approaching, it was at least 50 feet north of the viaduct. That fact being established, and also the fact that the collision occurred not over 100 feet north of the viaduct, it stands established as a fact that 1486 did not run to exceed 50 feet after its engineer, Wright, discovered the approach of 1220. A photograph introduced in evidence was taken at a point 420 feet north of the viaduct. It shows the barn above referred to, the cut and curve, and the rails of the track from that point to the viaduct, and clearly shows that at any point within that 420 feet two engines approaching from opposite directions would have a clear view of each other. 1486 being 50 feet north of the viaduct, it is beyond question that the point of view in the photograph could have been extended that number of feet farther north, so that there was a clear, open view of the track for the entire distance of 420 feet when the engines came within the vision of the two engineers. Of that 420 feet, 1486 only traveled about 50 feet when the collision occurred, while 1220 traveled 370 feet. As we view the record, there is no escape from these facts. This being true, then the conclusion is irresistible that the engineer of 1486 was proceeding north with his engine under full control; that the engineer of 1220 was proceeding south with his engine not under full control, but traveling at such a rate of speed that he was unable to stop it within a distance of 370 feet, and that, even after traveling that distance, his engine was still going at the rate of two or three miles an hour.

Mr. Burleigh, trainmaster for the Nebraska division of the defendant road, was called as a witness by defendant. Defendant's abstract of Mr. Burleigh's testimony sets out

only that part showing that engineers were examined by
him as to their fitness, and as to the published book of
rules; that he had examined Wright; that Wright had a
clear understanding of the rules; that he informed Wright
that switch engines had a right over all except first-class
trains in yard, and that other trains would have to look
out for them; that he read the rules to Wright, who gave
him his understanding of the same as they were read; that
Wright gave as his understanding of the term, "under
full control," as meaning "to run at a speed which would
make it impossible for two trains coming in opposite di-
rections to collide with one another." That is not the
meaning given by any other witness. If that be the mean-
ing of the term, you could not run an engine at all without
having a flagman in advance to warn you of approaching
trains. An important part of Mr. Burleigh's testimony,
not set out in defendant's abstract, appears in plaintiff's
supplemental abstract: "Q. When you say you examine
men for switch engines, do you use these rules? A. Yes;
and the time tables. Q. You tell switch engine men that
they have a right to run 25 miles an hour in the yards? A.
Yes, sir. Q. You tell them that? A. If they want to
—I don't tell them anything about running. Q. How is
that? A. I don't tell them anything about how fast they
shall run, or how slow. Q. You understand, of course,
that they can at any time run their engines negligently?
A. I understand that, yes."

Mr. Carr, the switch foreman, testified that when they
went around that curve they always slowed up to save
steam. "Q. But you went on the theory and assumed the
right that everything had to get out of the way for you ex-
cept this passenger? (By the term, 'this passenger,' the
questioner meant a passenger train which was due to pass
through a few minutes prior to the time of the collision,
but which train was some 12 or 15 minutes late.) A.
Yes, sir. Q. Although you knew the extra was in the
yards? A. Yes, sir. * * * Q. Have you any rule ap-
plying to switch engines about running under control?

A. No, sir." It will be seen, therefore, that in the defendant's yard the switch engine was a free lance as against all except first-class trains.

The second assignment is that the court erred in submitting the sufficiency and reasonableness of the company's rules to the jury. In the instructions complained of the court told the jury that the question as to whether the defendant was negligent in one or more respects alleged in the petition, as set out in subdivisions *a, b, c* and *d* of the first paragraph of the instructions, which stated the allegations of the petition, "is one of the material elements of plaintiff's cause of action to which the jury should direct their attention in determining upon their verdict. Negligence may be defined as the omission to do something which a reasonable man guided by those conditions which ordinarily regulate the conduct of human affairs would under the circumstances do, or doing something which a reasonable man would not do under the circumstances. In other words, negligence is the absence of care according to the circumstances." By instruction No. 8 the court instructed the jury: "Touching subdivision *a* of the first paragraph of these instructions, you are further instructed that it was the duty of the defendant company to exercise reasonable care to adopt and promulgate reasonable rules for the control and conduct of its business in all cases, in case its business had become sufficiently extensive to demand their adoption in the exercise of reasonable care for the protection of its employees. In this connection you are further instructed to determine from all the evidence in this case whether the defendant's rules with respect to the operation and control of its engines and trains, including its switch engines in the Lincoln yards, were reasonably sufficient for the protection of its employees at the time plaintiff's intestate sustained his injuries." Instruction No. 10: "You are instructed that under the rules of the company the light engine, which was being run by plaintiff's intestate as an extra, was required to run and pass through the Lincoln yards 'under

full control.' It is for you to say from the testimony
what the term 'under full control' means, and then to
apply your interpretation to the rules of the defendant
company in which the term is used, and also to the acts
of Otto O. Wright, in compliance with or failure to com-
ply with such rules, in determining whether his acts were
in compliance with or in violation of defendant's rules."
Instruction No. 11: "If you find from the evidence that
the defendant was negligent in one or more of the par-
ticulars alleged, and as set out in the first paragraph of
these instructions, and if you further find from the evi-
dence that such negligence proximately contributed to the
injury of plaintiff's intestate, then you should direct your
attention, among other things, to the defendant's claim
that plaintiff's intestate was negligent, and also that he
assumed the risks of his employment." The gist of de-
fendant's complaint as to the foregoing instructions is that
they submitted to the jury the reasonableness and suffi-
ciency of the rules governing the operation of the switch
engine in its yards. A number of authorities are cited by
defendant in support of its contention. While we concede
that in the main they sustain defendant's point that the
reasonableness and, in some cases, the sufficiency of the
rules are questions of law for the court, and not for the
jury, this is not by any means the universal rule.

In *Southern R. Co. v. Craig*, 113 Fed. 76, the syllabus
holds: "(1) Plaintiff's intestate, a railroad conductor on
an extra train, had orders to precede a delayed regular
train into defendant's yards. No instructions were given
to look out for any other train on entering the yards. In-
testate was killed in a collision with a switching engine
in the yards. No notice of the approach of the extra
train had been given to those on the switch engine. (In
this case the switching crew had full notice of the pres-
ence of 1486 in the yard.) The company's rules, known
to intestate, gave the right of way to switch engines in the
yards, and required that extra trains must approach and
run through yard limits under full control. The evidence

as to whether intestate's train was under full control was conflicting. The night of the accident was shown to have been dark and foggy. *Held,* That, notwithstanding the rules of the company, it was the duty of the crew of the switching engine to exercise ordinary care in avoiding collisions with incoming trains. (2) An instruction that the crew of the switching engine should take proper precautions against collisions with incoming trains, the character of such precautions to be determined by the circumstances of the night, the heavy fog, and the difficulty in hearing and seeing signals, was correct. (3) The question as to whether intestate observed the rule of having his train under full control on entering the yards was for the jury." In that case the company requested the following instruction: "Under the rules the switch engine had the right to the use of the main line, protecting itself against only regular trains. The extra was required to proceed through the yard under full control. This requirement applied, not only to the speed of the train, but to such precautions in addition as the dark and foggy night demanded. The switch engine having the right of way over the extra, it was the duty of the other to be on the lookout for the switch engine, and to take such precautions as the situation demanded to prevent a collision." The trial court modified the instruction by adding: "Yes; but it did not relieve the switching engine from the exercise of ordinary care in avoiding collisions with trains entering the yard." The defendant requested this instruction: "The rules of the company do not require notice of the movements of extra trains to be given to the crew of a switch engine working within the yard limits, and it is not negligence on the part of the defendant not to have given such notice," which the trial court modified by adding, "But the crew of the switching engine should take all proper precautions against collisions with trains entering the yard, the character of these precautions to be determined by the circumstances of the night, the heavy fog, and the difficulty in hearing and seeing signals." In the

opinion the court say (p. 79) : "We find no error in the modifications made by the court in giving the instructions requested. After giving the first instruction requested, the court simply said, in substance, that it was the duty of the switching engine to exercise ordinary care in avoiding collisions with trains entering the yard. We cannot conceive of any circumstances under which the operators of a railroad train are relieved from the use of ordinary care to prevent collisions with other trains. This is a duty that devolves upon those running and operating trains at all times. What constitutes ordinary care depends upon the relationship of the parties and the circumstances under which they act, and what would be ordinary care or common prudence under certain conditions would not be under others." The judgment of the trial court was affirmed.

We think this reasoning is eminently sound, and its application to the switching crew in charge of 1220 is apparent. They knew the extra was in the yard. They had been expressly notified of that fact. They knew that when the extra moved farther through the yards it would be running on the main track, and for them to run their engine upon the main track, around the curve and through the cut at the rate of speed at which they were unquestionably running was a reckless disregard of the lives of those upon the engine of the extra. That they knew that they were liable to meet the extra is shown by what Switchman McKinstry said when he saw 1486 coming. His language was: "Get off; here comes that extra. * * * Q. Let me refresh your memory; did you say, 'There she is'? Did you use that language? A. I don't know whether I did or not. Q. How? A. I don't know whether I did or not; I just told them to get off, 'There comes the extra.' " A rule that a switch engine may run through the yards, on the main line, not under control, but at a high rate of speed, when its crew all know that there is an "extra" on the main line passing through the yards, would be a barbarous rule; and, if the rules of a railway company

permit such a practice, it should be held liable for injuries to employees on the extra who are injured while such extra is being operated in compliance with the rules of the company, viz., under full control.  If the reasonableness of a rule is for the court, and not for the jury, the court should in such a case instruct the jury that such a rule is unreasonable.  Submitting the question to the jury in such a case could not, therefore, prejudice defendant.

Directly upon the question of submitting to the jury the sufficiency of the company's rules, *Texas & P. R. Co. v. Cumpston,* 40 S. W. 546 (15 Tex. Civ. App. 493), is an instructive case.  The fourth paragraph of the syllabus holds: "In an action for negligence of an employer in failing to provide rules, whereby an employee was killed, plaintiff need not allege or prove exactly what rules should have been made."

Mr. Labatt in his work on Master and Servant, vol. 1 (ed. 1904), sec. 228, in discussing the question of reasonableness, says: "Whether the reasonableness of a rule is a question for the court or the jury is one as to which there is much apparent conflict between the authorities.  One theory is that this question is always for the court; the reason assigned for this view being that it would otherwise be impossible to secure a uniformity of view, or to insure that a rule pronounced reasonable in one case by a jury might not be pronounced unreasonable by another jury in a subsequent case.  Another view is that the question is primarily one for the jury.  Some courts have enunciated an intermediate doctrine which seems to be more in harmony with general principles, viz., that the reasonableness of a rule is a mixed question of law and fact, except in plain cases."  The author cites numerous authorities in support of all three of the theories.

In *Crew v. St. Louis, K. & N. W. R. Co.,* 20 Fed. 87, it is held in the syllabus: "It is negligence on the part of railroad companies to fail to adopt such rules and regulations as are proper and necessary for the protection of

the safety of its employees." The trial court charged the jury: "I say generally that the railway company has a right, and it is its duty, to make rules for the protection of the safety of its employees, and such rules its employees are bound to regard and obey. But under the form of making rules, of course, a railroad company cannot exempt itself from negligence. Its rules must be such as tend to the protection of the lives of its employees. With this general statement in regard to the rules, you may take and consider them." The jury found for the plaintiff, and in an opinion by Brewer, J., the verdict was sustained, and the motion for a new trial was overruled.

In *Merrill v. Oregon Short Line R. Co.*, 29 Utah, 264, the syllabus holds: "(1) A master is under a primary and nondelegable duty to use ordinary care not only to promulgate, but also to enforce, reasonable rules and regulations for the safety of his servants, when the nature of the work requires it, and this duty is not performed merely by promulgating the rules, and using ordinary care in selecting men to enforce them. (2) The fact that the negligence of a fellow servant concurs with the negligence of the master in causing injury to a servant does not exempt the master from liability for his negligence." In the opinion (p. 279) it is said: "We think the evidence on behalf of respondents was quite sufficient to submit to the jury the question as to whether appellant used ordinary care, not so much, probably, in establishing and promulgating rules and regulations, but particularly in using ordinary care to enforce them.  *  *  *  The truth and the weight of this testimony were for the jury, which, if believed by them, was sufficient to find that ordinary care had not been used by the appellant in either establishing or in enforcing rules and regulations for the safety of its servants."

In *Murphy v. Hughes*, 40 Atl. 187 (1 Pennewill (Del.) 250), it is held: "The question as to whether an employer has made proper rules for the government of his employees is for the jury." In the opinion it is said (p.

188) : "It is, however, always a question for the jury to determine whether such rules are sufficient for the purpose."

In *Devoe v. New York C. & H. R. R. Co.*, 66 N. E. 568 (174 N. Y. 1), the first paragraph of the syllabus reads: "Car inspectors, employed at a station at which there were many tracks and switches upon which a large number of trains passed every day, were required to inspect each car of each train while it was at the station, at which time there was much switching and moving of cars. Several inspectors had been injured in the performance of such duties, and many complaints had been made as to the dangerous character of the work. There was but one printed rule on the subject, which had never been enforced. *Held*, in an action for the death of a car inspector killed by the backing up of a train against the train under which he was working, that it was for the jury whether a parol rule, claimed to have been made by the foreman of the car department, without instructions from any one, was in use, and was sufficient, and properly promulgated under the facts."

In *Lake Shore & M. S. R. Co. v. Murphy*, 50 Ohio St. 135, it is held: "It is the duty of a railway company to afford reasonable protection to its employees against dangers incident to their work. *Railway v. Lavalley*, 36 Ohio St. 221, approved and followed. And if, under the circumstances of this case, a rule providing for warning was necessary, and by the exercise of reasonable care on the part of the company that necessity could have been foreseen, it was the duty of the company to prescribe such rule. Whether it ought to have so provided or not was a question for the jury."

In *Abel v. Delaware & Hudson Canal Co.*, 9 N. E. 325 (103 N. Y. 581), it is held: "In an action against a railroad company for damages for the death of an employee, a repairman, which occurred while he was engaged in repairing defendant's cars standing upon a side-track, which were run into by one of defendant's engines, it is

for the jury to say whether or not defendant's rules providing for the safety of repairmen so employed are adequate for that purpose, and the court errs in ruling, as matter of law, that they are sufficient." In closing the opinion the court say (p. 326) : "We do not perceive how it was possible to say, as matter of law, that the rules of the defendant were proper and sufficient for the protection of its repairmen, and that it should not have taken greater precautions, by rules or otherwise, for their safety. We think the facts should have been submitted to the jury, and that the nonsuit was improper." A judgment of reversal, therefore, followed.

In *Chicago, B. & Q. R. Co. v. McLallen, Adm'r,* 84 Ill. 109, the fourth paragraph of the syllabus holds : "A railway corporation has the lawful right to make reasonable rules for the conduct of its employees, and also for the conduct of passengers. Whether any given rule be reasonable, and therefore within the power of the corporation, or whether it be unreasonable, and therefore *ultra vires,* is a question of law for the court; but whether such rules are adequate for the safety of others, and the management of the trains, is a question of fact for the jury." In that case the decedent was a conductor in charge of an extra train, commonly called a "wild train." Plaintiff recovered a verdict and judgment for $4,500, which was affirmed. In the light of the authorities above cited, to which others might be added, defendant's second assignment must be decided adversely to it.

The third assignment is that the court erred in submitting to the jury subdivison *b* of instruction 1, viz.: "In the failure to give said Wright timely warning by bell or whistle of the approach of said switch engine." The language above referred to was used by the court simply in stating the issues to the jury. Defendant has not called our attention to any other instruction where that language is used.

The fourth assignment is that the court erred in submitting to the jury the question whether defendant's em-

ployees upon the switch engine, as soon as they discovered the engine of plaintiff's intestate, jumped from their engine without reversing the same and without trying to stop. Counsel say this question should not have been submitted to the jury, for the reason that the undisputed testimony in this record of the witnesses introduced by both plaintiff and defendant is that, at the very first moment the presence of 1486 was known, the engineer applied all the apparatus on the engine to stop it, and actually did stop it in a very short distance. The trouble with this contention is that the undisputed evidence does not show, absolutely, that the engineer applied all the apparatus on the engine to stop it; but, instead of showing that he actually did stop it, the evidence shows that it had not stopped when the collision occurred. This question was properly submitted to the jury.

The fifth assignment is that the court erred in submitting to the jury the question as to whether defendant was guilty of negligence in running the switch engine around a curve at a negligent and dangerous rate of speed without having the same under control. What we have said under the first assignment disposes of this adversely to defendant.

The sixth assignment is that the court erred in giving instruction No. 10. This instruction has already been set out and disposed of under the second assignment.

The seventh assignment is that the court erred in giving instruction No. 13: "As to the defense of contributory negligence, and also as to the defense of assumption of risks, the burden of proof is upon the defendant to establish both of said defenses by a preponderance of the evidence, as those terms have been hereinbefore defined." There was no error in this instruction. *Grimm v. Omaha E. L. & P. Co.*, 79 Neb. 395; *Dowd v. New York, O. & W. R. Co.*, 170 N. Y. 459; *Arenschield v. Chicago, R. I. & P. R. Co.*, 128 Ia. 677; *Mace v. Boedker & Co.*, 127 Ia. 721.

The eighth assignment is that plaintiff's intestate was guilty of gross negligence. We spend no time in discuss-

ing this assignment as there is an entire absence of evidence to show any negligence on the part of plaintiff's intestate.

The ninth assignment is the legal sufficiency of the evidence for the court. In discussing this assignment, counsel say that in the trial court counsel for plaintiff relied on the Nebraska Employers' Liability Act (Comp. St. 1911, ch. 21, secs. 3-5), which modifies the defense of contributory negligence. What we have said in answer to the eighth assignment is a sufficient answer to this. There was no contributory negligence on the part of plaintiff's intestate. This also disposes of the tenth assignment.

The eleventh assignment is that the verdict was the result of passion and prejudice, and is excessive. The evidence shows that the decedent was a man of good health, 32 years of age; that he was earning from $125 to $150 a month; that his expectancy, according to the Carlisle table, would be 32 years. We cannot say that $15,000 is an excessive judgment for the death of a man under these circumstances.

The twelfth assignment is that the decedent assumed risk of collision with switch engines. We think counsel for the plaintiff answer this contention in plaintiff's brief, where it is said: "Engineer Wright assumed the risks ordinarily incident to the business he was engaged in, but he did not assume any negligence of the defendant, and certainly did not assume the reckless conduct of the switch engine on this particular day."

The thirteenth assignment is that the court erred in submitting the case under the Employers' Liability Act. The contention under this assignment is that engine 1486 was on its way from Fairbury to Council Bluffs, Iowa, and hence Wright "was engaged in interstate commerce." It is probably true that, if Mr. Wright was engaged in interstate commerce at the time he was killed, the remedy would be under the federal act exclusively, but the trouble with this contention is, neither Mr. Wright nor engine 1486 was at the time engaged in interstate com-

merce. His order was to take this engine from Fairbury, in Nebraska, to Albright, in Nebraska. He was running the engine without cars or train of any sort. The engine, so far as we can gather from the record, was defective, and was on its way to the car shops for repairs. In *Chicago & N. W. R. Co. v. United States,* 168 Fed. 236, the circuit court of appeals for this circuit held: "The necessary movement of a defective empty car alone, for purpose of repair only, and not in connection with any cars commercially used, does not subject the carrier to the penalties of the acts." A similar holding was made by the same court in *United States v. Rio Grande W. R. Co.,* 174 Fed. 399. The same rule will, of course, apply to an engine.

We have given this case very careful consideration. We have examined the record with great care, and are unable to find in it any prejudicial error. The judgment of the district court is therefore

AFFIRMED.

HAMER, J., dissenting.

1. Whether the defendant railway company formulated and promulgated any written or printed rule regulating the rate of speed that its switch engines might be run in the yards at Lincoln does not present any question of negligence for the jury to consider, unless in this particular case this part of the track run over was so run over by the switch engine at an unreasonable rate of speed, considering all the circumstances, and especially that this part of the yards was in a cut in a curve of the road, and so might have imperiled the safety of plaintiff's decedent. As the jury were not so told, and were not properly instructed touching the question, I am under the impression that there is prejudicial error in the proceeding and in the instructions given, as also in the third paragraph of the syllabus of the majority opinion. Whether the railroad company did or did not lay down a rule for the guidance of its employees concerning the rate of speed at

which the switch engine should be run in the yards is immaterial, unless it is shown by the evidence that the switch engine was run too fast and had such an unreasonable rate of speed as to endanger the safety of the decedent. The third paragraph of the syllabus is objectionable.

2. It must be all a matter of speculation, in the absence of any rule, that if a reasonable rule had been made by the railroad company touching the running of the switch engine in its yards it would have controlled, or even influenced, the conduct of the crew in running such switch engine. For this reason, the theory of the opinion seems to be wrong.

3. By instruction No. 8 the court instructed the jury: "Touching subdivision *a* of the first paragraph of these instructions, you are further instructed that it was the duty of the defendant company to exercise reasonable care to adopt and promulgate reasonable rules for the control and conduct of its business in all cases, in case its business had become sufficiently extensive to demand their adoption in the exercise of reasonable care for the protection of its employees. In this connection you are further instructed to determine from all the evidence in' this case whether the defendant's rules with respect to the operation and control of its engines and trains, including its switch engines in the Lincoln yards, were reasonably sufficient for the protection of its employees at the time plaintiff's intestate sustained his injuries." The effect of this instruction would seem to be to turn the jury loose in the field of speculation as to whether the railroad company might not have improved its rules touching the protection of its employees, and if for any reason it had not done so, that it is liable in this case. The trouble with this sort of thing is that the attention of the jury is not called to any specific thing which may have contributed to the death of plaintiff's decedent.

It is well said in the majority opinion: "A rule that a switch engine may run through the yards, on the main

line, not under control, but at a high rate of speed, when its crew all know that there is an 'extra' on the main line passing through the yards, would be a barbarous rule; and, if the rules of a railway company permit such a practice, it should be held liable for injuries to employees on the extra who are injured while such extra is being operated in compliance with the rules of the company, viz., under full control. If the unreasonableness of a rule is for the court, and not for the jury, the court should in such a case instruct the jury that such a rule is unreasonable." I apprehend that the railway company may make no rule which would relieve the crew of the switching engine from exercising ordinary care and common prudence to avoid a collision, but the language used in the instruction quoted is of a most general character. That turns over to the jury the question of determining whether a better set of rules might not have been constructed, and, if so, then the inference is that it is the duty of the jury to find that the defendant is liable. I do not think that this can be the law. If the jury is turned loose and told that it may occupy as wide a province as it likes, it will be almost sure to find that other and better rules might have been made. When it is remembered that jurors are not specially instructed along the line of operating railways and formulating rules for their management, it must be seen that the instruction is an invitation to pursue any theory which may present itself to the imaginative mind of the juror.

The first case cited in the majority opinion is that of an inferior court. The Texas case cited does not seem to be clearly in point. The other cases cited do not seem as broad as the instruction in the instant case.

4. Instruction No. 9, requested by the defendant, reads: "You are further instructed that the defendant was not required to insure its locomotive engineers from collisions with switch engines or other like accidents resulting from the management of trains; that defendant's duty to the employees was only to use reasonable care and diligence

in the management and operation of its switch engines, and unless you find that the defendant, or its agents and employees, failed to use reasonable care and diligence in the management of its switch engine, and as a consequence thereof plaintiff's intestate was injured, you cannot find for plaintiffs." I think the above instruction requested by the defendant should have been given.

5. It was according to the theory of the defendant's case that the plaintiff's intestate was running his engine at a rate of speed so great as not to be under full control, and that this was the proximate cause of the injury. Touching this matter, the defendant requested the giving of an instruction as follows: "Instruction No. 13. You are instructed that the company has promulgated and published rules governing the operation of locomotive engines and trains in the Lincoln yards; and that, under said rules, Otto O. Wright was bound to run his engine through the Lincoln yards under full control. You are instructed that an employee, if within his power so to do, is bound to obey all of the reasonable rules and instructions of his employer with reference to the conduct of his business, and if you find from the evidence that at or immediately before the accident, when the engines first came in sight of each other, the said Otto O. Wright was running his engine at a rate of speed so as not to be under full control, and that this was the proximate cause of the injury, then you are instructed that plaintiffs cannot recover." I think it should have been given.

For the foregoing reasons, I dissent from the majority opinion.