LIZZIE L. WRIGHT ET AL., APPELLEES, v. CHICAGO, ROCK.
ISLAND & PACIFIC RAILWAY COMPANY, APPELLANT.

FILED APRIL 18, 1914.  No. 17,189.

Opinion on motion for rehearing of case reported in 94
Neb. 317. *Rehearing denied, and former opinion modified.*

PER CURIAM.  After the reargument in this case, we
have carefully reexamined the record and are satisfied with
the following language in the former opinion (94 Neb.
317) for the reasons there given: "A rule that a switch
engine may run through the yards, on the main line, not
under control, but at a high rate of speed, when its crew
all know that there is an 'extra' on the main line passing
through the yards, would be a barbarous rule; and, if the
rules of a railway company permit such a practice, it
should be held liable for injuries to employees on the ex-
tra who are injured while such extra is being operated in
compliance with the rules of the company, viz., under full
control.  If the reasonableness of a rule is for the court,
and not for the jury, the court should in such a case in-
struct the jury that such a rule is unreasonable.  Submit-
ting the question to the jury in such a case could not, there-
fore, prejudice defendant."  The decedent was running
his engine under full control, within the meaning of the
rule of the company.  There was no express rule as to
the speed allowed to the switch engine.  Of course, the law
requires that such engine should not be run at an un-
reasonable rate of speed under the circumstances.  The
engineer of the switch engine must have had a clear view
of the approaching engine for at least 420 feet, and it was
run at least 370 feet of this distance before the collision
occurred.  It could have been stopped within a distance of
60 feet unless running at a greater speed than 20 miles an
hour; and, knowing, as the crew of the switch engine did,
that No. 1468 was in the yards, to run at a greater speed
than 20 miles an hour in such a locality and under such

circumstances was in itself negligence. In such a case the court might properly have told the jury that any rule of the company which permitted such action was unreasonable, and the giving of an erroneous instruction as to the reasonableness of the rules would be without prejudice to the defendant. There is, however, no doubt that the instruction given by the court was erroneous. The jury were told: "In this connection you are further instructed to determine from all the evidence in this case whether the defendant's rules with respect to the operation and control of its engines and trains, including its switch engines in the Lincoln yards, were reasonably sufficient for the protection of its employees at the time plaintiff's intestate sustained his injuries"—thus submitting to the jury to determine the reasonableness of the rules of the company as a whole so far as they were or were not sufficient to protect the employees. Different juries might not take the same view of a system of rules for the running of trains and engines in a complicated railroad yard, and it is beyond their power to determine what those rules should be. When the question of negligence depends upon the reasonable sufficiency of a certain rule, the court should determine the question, if the facts are not in dispute. If the facts upon which the reasonableness of the rule depends are in substantial conflict, the court should tell the jury plainly under what conditions the rule would be reasonable and allow the jury to determine the facts. In such cases the reasonableness of the particular rule becomes a mixed question of law and fact, the law to be determined by the court and the facts by the jury. To this extent our former opinion is modified, and, as there is no prejudicial error in the verdict for the reasons stated above, and in our former opinion, the motion for rehearing is overruled and our former judgment adhered to.

REHEARING DENIED.

HAMER, J., dissenting.

1. I feel that I am in duty bound to dissent from the majority opinion. We cannot too zealously protect the rights of litigants. As I look upon it, the errors of the

trial court which contributed to the bringing about of the verdict and the judgment are most manifest. The majority opinion concedes the following instruction to be wrong, but undertakes to say that it worked no injury to the defendant. It is claimed that it was not prejudicial. The jury were told by it: "In this connection you are further instructed to determine from all the evidence in this case whether the defendant's rules with respect to the operation and control of its engines and trains, including its switch engines in the Lincoln yards, were reasonably sufficient for the protection of its employees at the time plaintiff's intestate sustained his injuries." It is argued that the foregoing was erroneous, and it is said that the reasonableness of the rules of the company as a whole should be determined by the court, and not by the jury, and it is claimed that for this reason the instruction could have done no harm. To this I say that, if the particular instruction conduced to the bringing about of a wrong verdict and a wrong judgment, then this court should undo what the lower court did. That is the beginning and the end of it. By the instruction quoted the jury were turned loose to determine whether the railroad company should not have made better rules for the protection of its employees. Of course, in such a case the jury have not been instructed along the lines of conducting a railway. They had no special instruction on the subject. Neither are they lawyers. They are wholly disqualified from the standpoint of practical mechanics and legal knowledge. But turned loose with the invitation to range at large in the field of speculation in determining whether the rules adopted might not have contributed to bringing about the result, they would be sure to condemn the railway company. When they condemned the railway company they did it by the rendition of a verdict which was reached because of the error of the trial court. It is said in the majority opinion that, if the facts upon which the reasonableness of the rule depends are in substantial conflict, then the court should tell the jury under what conditions the rule would be reasonable and then allow the jury to de-

termine the facts. It is further said that the reasonableness of the particular rule becomes a mixed question of law and fact, the law to be determined by the court and the facts by the jury, and that to this extent the former opinion of this court is modified. But that reasoning has nothing to do with the question as to whether the instruction conduced to the bringing about of this verdict. It perhaps determines something for the future, but it determines nothing in the present. The instruction of the lower court sent the jury on a wild goose chase after the construction of rules for the protection of employees, when it should have directed their attention to the practical question of whether the switch engine was run too fast. If that switch engine was run too fast and thereby caused the death of the plaintiff's decedent the railway company is to be blamed for its negligence. The jury were not told that. Instead, they were told "to look about and find something." Of course, they found it. Whatever the rule, it would not justify the railway company in running its switch engine too fast. It could make no rule to justify that and the actual thing to be considered by the jury was whether the switch engine did or did not run too fast and whether because of that fact it did not bring about the collision and occasion the death of the deceased. The railway company could make no rule which would relieve the crew of the switch engine from exercising ordinary care to avoid a collision.

2. The defendant requested the giving of instruction No. 13. As requested it contained the following: "And if you find from the evidence that at or immediately before the accident, when the engines first came in sight of each other, the said Otto O. Wright was running his engine at a rate of speed so as not to be under full control, and that this was the proximate cause of the injury, then you are instructed that plaintiffs cannot recover." This involved the idea that, if the decedent was himself negligent and by his negligence contributed to his death, the plaintiffs may not recover. This ought to be the law. I believe it to be the law, and that the trial court should have ob-

served it, and should have properly instructed the jury on that question.

3. A careful reading of the evidence may justify the conclusion that the deceased was not running his engine at an excessive rate of speed immediately before the accident occurred, but such examination as I have given to the testimony quoted in the briefs has created the impression in my mind that he was running his engine at the rate of ten miles an hour, or thereabouts, and that rate seems too fast to run in a cut over a curve where the view was obstructed, as it was in this case. I think that the deceased was negligent in maintaining a greater rate of speed than the conditions permitted and that he thereby contributed to the causes which produced his death. It is not enough that the case was submitted to a jury. There should be evidence sufficient to bear examination by an impartial, intelligent and discriminating mind, which should find therein facts and reason sufficient to sustain the verdict. If the deceased by his conduct brought about the danger which caused his destruction, the railway company ought not to be compelled to pay.

4. But whatever may be the finding concerning the rate of speed, it is apparent from an examination of the testimony of the witnesses that the deceased disregarded the rule which required him to run his engine "under full control." John Bell, a locomotive engineer for 13 years, had run from Fairbury to Council Bluffs. He testified: "Q. In passing around and over that curve, Mr. Bell, what is the highest amount of speed that could be obtained and be under control?" He answered: "Not over five miles an hour." Engineer Hall testified: "The maximum speed at which an engine could run around and through that curve at Holdrege street, *being under full control,* would not be over four or five miles an hour at *any point* in that curve." W. B. Oakford, the road foreman of equipment, who had had 18 or 19 years experience as an engineer, testified: "The man who is supposed to run 'under full control' would have to go in that cut and around that curve at the rate of from three to five

miles an hour." He is positive that the rate of speed should not exceed five miles an hour in any event. B. J. Shamp testified: "I should not think a person would be absolutely *under full control* going over five miles an hour, because you cannot see far enough around that cut to be able to stop, to be going at a greater speed." J. J. Breheny testified that he was familiar with the term "under full control;" that the maximum rate of speed "in running around this curve" in order to keep within that definition and in order to keep within control should not exceed five miles an hour, *the distance you can see any obstruction on the track to be clear "is not a great deal, and I would want to stop very quickly."* J. E. Odey, a locomotive engineer for 25 years, and who was familiar with the place, testified that he was familiar with the term "under full control," and that "running *under full control* through the cut and round the curve at Holdrege street would be from three to five miles an hour going east." John T. McLean testified that to exceed five miles an hour around this Holdrege street cut and curve would *not* be going "under full control."

The engineer who was killed apparently took his life in his hands when he went in that cut so fast that he would be unable to stop within the distance that he could see. He was not, according to the testimony of these witnesses, going "under full control." If he went to his death because of his fearless recklessness, the railway company ought not to pay.

5. The deceased operated an "extra." It was an inferior train expected to run "under full control." It was to find the main track occupied. It was to be able to stop *within the distance that the vision of the engineer showed the track to be clear.* That is what is meant by "under full control." The trial court submitted to the jury whether the company's rules with respect to the operation and control of its engines and trains, including its switch engines in the Lincoln yards, were reasonably sufficient for the protection of its employees. The question was not tried like any other issue of fact. The rules being proved,

the plaintiff proceeded to contend that they were insuffi-
cient, and the judge licensed the jury to go out on an ex-
ploring expedition of its own. The jury were permitted to
come to any conclusion they liked and without any direc-
tion of any kind by the court. The contention in the ma-
jority opinion that the position of the trial court was
sound is said to be supported by *Southern R. Co. v. Craig,*
113 Fed. 76. If I understand that case, it did not submit
to the jury whether the rules of the defendant company
were sufficient. The case simply holds that it was for the
jury to say whether the switch engine exercised ordinary
care in avoiding a collision with the incoming train. It
may be said that it would always be the duty of the engi-
neer of the switch engine or any other engine to exercise
ordinary care to avoid a collision. I have made an exam-
ination of some of the other cases cited in the majority
opinion. I am unable to agree with my associates.

6. In the original majority opinion there is the follow-
ing: " 'Q. Have you any rule applying to switch engines
about running under control? A. No, sir.' It will be
seen, therefore, that in the defendant's yard the switch
engine was a free-lance as against all except first-class
trains." The opinion emphasizes the fact that under the
rules the switch engine did not have to run "under full
control," while the engine attached to the train was re-
quired to do so. The opinion seems to regard this as re-
strictive and irksome. It is further said in the original
majority opinion: "If the reasonableness of a rule is for
the court, and not for the jury, the court should in such a
case instruct the jury that such a rule is unreasonable.
Submitting the question to the jury in such a case could
not, therefore, prejudice defendant." The contention is
that neglect of the court to discharge its duty and at the
same time violating and neglecting a duty that is incum-
bent upon it, and requesting the jury to do something it
has no authority to do, is without prejudice. The con-
tention is to the effect that a wrong conception of its duty
by the court and a wrong exercise of that duty hurts no-
body. The original majority opinion seems to the writer

to be clearly wrong in that contention. It is to the effect that the court may be blind and the jury may be blind, and yet nobody is hurt because no one can see the wrongful thing that is done.